In re Valory Denise RAY, Debtor.

In re Charles Wayne Swan, Freda Annette Swan, Debtors.

In re John Richard Shelby, Misty Diane Shelby, Debtors.

Nos. 103–02131, 103–09245, 103–11852.

United States Bankruptcy Court, M.D. Tennessee.

Sept. 20, 2004.

644

Beth R. Derrick, Lloyd Mueller, Office of the United States Trustee, Nashville, TN, for United States Trustee.

Glenn Cox, Attorney at Law, Columbia, TN, for Robert J. Harlan.

## MEMORANDUM

GEORGE C. PAINE, II, Chief Judge.

### I. Introduction

These matters are before the court on the United States Trustee's ("UST") "Motion to Disgorge Attorney Fees Under Section 329 of the Bankruptcy Code." In all of these cases, the UST seeks disgorgement of Robert Harlan's attorney fees in connection with the redemption of automobiles in the above chapter 7 cases on the basis of the existence of a conflict of interest and unreasonableness. Mr. Harlan hired independent counsel and objected to the UST's motion. Following a day long evidentiary hearing, the court took the matter under advisement. For the reasons contained herein, the court denies the UST's Motion to Disgorge Attorney Fees.

### II. Factual Background

#### A. General Facts Related to All Cases

These three otherwise unrelated bankruptcy cases have been consolidated for trial purposes on the UST's motions to disgorge fees. In each case, the debtors redeemed a vehicle pursuant to 11 U.S.C. § 722 whereby the debtors borrowed the redemption funds from an entity called "722 Redemption Funding, Inc." ("722"). 722 is a for profit corporation headquartered in Cincinnati, Ohio. It has been operating about 11 years, and has provided redemption loans to more than 15,000 debtors. According to 722's website, the company's philosophy is to: "loan the money our borrowers need to keep or put them in a vehicle they can afford and maintain an appropriate loan to value ratio during the term of repayment." *(Ex. 6); see also 14 CONSUMER BANKRUPTCY NEWS, "Redemption Financing Helps Debtors Keep Cars Without Reaffirmation," Issue 18, p. 1, 4 (Sept. 2, 2004).*[1]

The debtors' loans with 722 included a provision that allowed the debtors to borrow enough funds to pay Mr. Harlan's attorney fees associated with the redemption. At the closing of each of the loans, 722 disbursed the loan proceeds that paid off the redemption value to the secured creditor, paid the fees associated with the loan, and paid Mr. Harlan's attorney fees. The UST objects to this arrangement arguing that "Mr. Harlan accepted, or appeared to accept, financial incentives to refer his clients to 722 Redemption Funding, Inc., ... resulting [in a] conflict of

---

[1] 722's website also provides a "Typical Example" of when a 722 loan is made. It provides as follows:

*Without a Newstart Loan*
- Your client's loan payoff is $15,000
- The vehicle is worth $8,500
- Assuming a remaining term of 4 year at a 12% interest rate . . .
- a reaffirmation payment would be $395.01 per month for the remaining 4 years . . .
- for a total of $18,960.48
- Your *client doesn't have $8500* in a lump sum payment to keep his or her vehicle in a chapter 7 environment, therefore your client has little option but to do a reaffirmation

*With a NewStart Loan*
- The vehicle worth $8,500 could be redeemed by a NewStart Loan
- For a payment of only $297 . . .
- Over the same 4 year period
- For a difference of nearly $100 a month and nearly . . .
- $4,800 over the same 4 year period

As you might expect, the rate of interest on our redemption loans is higher than normally charged on automobile loans to people not in bankruptcy (The rate used to calculate the specific numbers above was 24%).

interest," and that the fees charged for these redemptions are unreasonable for these routine redemption services. *See Memorandum Filed by the United States Trustee in Support of the Motion for Disgorgement*, Adversary Docket No. 55, p. 1–2 (July 12, 2004).

Mr. Harlan responded that no conflict of interest exists in any of these cases, and that the reasonableness of the fees is easily sustainable after a review of the time and effort spent on each redemption transaction. Mr. Harlan further contends that a review of the circumstances of each of the cases' factual history and the overall transactions supports the entitlement to attorney fees.

Mr. Harlan has been practicing bankruptcy law in Columbia, Tennessee since 1983, and in the last twelve years has done only chapter 7 and 13 cases. He is a certified consumer bankruptcy attorney. In the last year or so, of the 1200 cases he filed, about 66% were chapter 7's and 33% were chapter 13's. *(Ex. 5, p. 8)*. His basic filing fee for chapter 7 consumer cases is $600. *(Ex. 5, p. 21–22)*. He testified that this fee includes all uncontested, routine matters in chapter 7. It does not include adversaries or other contested matters. Mr. Harlan testified that he started charging for automobile redemptions because the cost of business continues to rise and rather than pass on the inflation by raising the standard flat rate for all, he decided to pass it on to the clients for whom he was doing the most work.

Mr. Harlan explained that with every new client, an attorney, either he. Terry Gordon, or Shannon Barhill, conducts the initial "intake" interview. One of the topics normally covered at the intake interview is what will happen with the debtor's vehicle. Typically, Mr. Harlan explained that the attorneys in his office go through a side-by-side comparison of the cost of redemption versus reaffirmation of existing debt. *(Ex. 5, p. 57)*. Mr. Harlan's deposition stated that there is no office policy about 722, but that 722 is considered one alternative for debtors. *(Ex. 5, p. 21)*. There are several automotive dealers in Columbia that will lend money to debtors, but only after entry of the discharge, according to Mr. Harlan. *(Ex. 5, p. 25–26)*. Mr. Harlan did not recall any specific conversation about those dealers with the debtors in these cases, but he explained that the topic is one that is normally covered in the initial "intake" interview. *(Ex. 5, p. 27–28)*.

In 2002, Mr. Harlan first learned of 722 at a seminar booth and through mailings brought in by his clients. Mr. Harlan estimates that 722 has been used by his clients in approximately 10 to 20 redemptions. They pay Mr. Harlan's standard fee of $300 via a paper check following closing of the loan. *(Ex. 5, p. 15)*. The interest rate on the three loans at issue is 24%, and Mr. Harlan has never attempted to negotiate a different rate. Further, he did not recall discussions about payment of the $300 directly from the debtors rather than borrowing the funds. Mr. Harlan's recollection was that the debtor's preferred to borrow the funds because they were typically low on cash.

As to what normally occurs in a vehicle redemption motion, Mr. Harlan testified that although many are routine, complicating factors *can* occur such as: (1) explanation of redemption procedure; (2) if 722 is used, determination of whether the loan was approved; (3) arranging of an appraisal; (4) preparation of a motion to redeem; (5) determination of whether a proof of claim has been filed; (6) if an objection is filed, discussion of resolution with the creditor; (7) review of valuation reports; (8) if contested, preparation of an appraiser and the debtor for hearing; and (9)

attendance at valuation hearing if no settlement is reached. *(Ex. 5, p. 50–71)*.

As to the specific dealings with 722, Mr. Harlan testified that he has no business arrangement with 722 to send clients to them. He normally receives a vehicle condition report and letter from 722 showing conditional approval of a loan, and a preliminary comparison of the reaffirmation versus the redemption to demonstrate the benefit to the client. The originals are sent to the client, and the copies to Mr. Harlan. 722 also sends a copy of the proposed contract. Mr. Harlan typically files that contract with the motion to redeem or at least sends a copy to the UST's office. *(Ex. 5, p. 36–37)*. Mr. Harlan indicated that if 722 produces all necessary documents, his office can generate a motion for approval in about 15 to 30 minutes. From there it goes through several stages to get the order for approval.

If the order is approved, Mr. Harlan notifies 722. They in turn send the original contracts to the clients; the clients sign and return them, and 722 funds the loan. Mr. Harlan does not recall if in any of these cases, the loan documents were signed in his office, but he explained that he is planning to institute that policy to make sure all paperwork is completed following the redemption approval order. *(Ex. 5, p. 38)*.

In all cases, Mr. Harlan testified that he does not believe a conflict of interest exists because he owes no duty to 722. The clients are simply borrowing the money to pay the fees, and since most bankruptcy clients cannot afford to pay the fees otherwise, borrowing the fees does not add to their already burdensome finances. In Mr. Harlan's opinion, there is no per se conflict of interest in borrowing funds from a third party to pay attorney fees.

### B. Facts Specific To Each Case
#### 1. Valory Denise Ray

Ms. Ray presently is employed at Nu-Kote working with toners, ink machines and copy machines making about $10.18 per hour on a 40 to 45–hour work week. *(Ex. 1, p. 5–6)*. At the time of her bankruptcy filing, Ms. Ray had completed a ninth grade education, and was financially burdened by her car note and other bills. *(Ex. 1, p. 7)*. Ms. Ray hired Mr. Harlan because her mother had had a good experience with Mr. Harlan and "thought he was a good person." After meeting initially with Mr. Harlan, Ms. Ray filed a chapter 13 bankruptcy petition in February of 2003. The case was converted to chapter 7 because Ms. Ray felt she had too much coming out of her paycheck. *(Ex. 1, p. 11)*.

For the bankruptcy services, Ms. Ray testified that she paid Mr. Harlan $900. Of that $900, $300 was to be paid through 722. *(Ex. 1, p. 16)*. Ms. Ray called Mr. Harlan's office when she wanted to discuss conversion of her case, and at that time April, one of Mr. Harlan's employees, told Ms. Ray about 722. Ms. Ray then contacted 722, and *(Ex. 1, p. 19)* she testified that she understood that 722 would refinance her car note so that she could keep her car.

Ms. Ray's deposition indicates that she was not counseled about surrendering her car, and did not look for a different car because she wanted to keep her own car and not go further into debt. *(Ex. 1, p. 20)*. She testified that she felt there was no disadvantage or negative to using 722 to redeem her car. *(Ex. 1, p. 21)*. When reviewing her note, security agreements, and disclosures with 722, Ms. Ray did not understand most of the charges and fees, but explained that she was aware of the $300 she borrowed from 722 to pay Mr. Harlan's attorney fee. *(Ex. 1, p. 22–23)*.

The interest rate on the loan is 24%, but Ms. Ray does not consider that to be a high rate. *(Ex. 1, p. 24).* As to Mr. Harlan's fee, Ms. Ray explained that April told her that Mr. Harlan was being paid $300 at the end of the 722 transaction.

Ms. Ray testified that she is satisfied with the job Mr. Harlan did for her, and is happy to keep her car by refinancing with 722 to pay off her original lender (Transouth). *(Ex. 1, p. 32, 35).*

Mr. Harlan's recollection of the Ray case is that hers was not a run of the mill redemption because the debtor had been in a chapter 13 before converting. When the debtor felt she could no longer afford the payments in her chapter 13 case, she wanted to convert. She felt that her vehicle would wear out before she could complete the plan payments. Mr. Harlan converted her case for her, but she was more than $2,900.00 in arrears on her payments on her car and she had a high interest rate loan.

Mr. Harlan testified that he researched the issue of the valuation for redemption purposes following conversion. When he did not find any controlling law, he hired an appraiser hoping the lower valuation would persuade the lender not to object to the redemption motion at the lower value. He did receive a lower valuation, and the lender did not oppose the redemption motion. Mr. Harlan estimates that he spent about 3.8 hours of attorney time and 2.7 hours of staff time on the redemption of Ms. Ray's vehicle. His hourly rate is $250 per hour.

### 2. *Charles Wayne Swan and Freda Annette Swan*

Mrs. Swan is a 13–year employee of Lewisburg Seating, a division of Saturn making $14.10 per hour. She is 57 years old and was educated through the seventh grade. *(Ex. 2, p. 38).* She can write, but cannot read well. *(Ex. 2, p. 35).* Mrs. Swan was married at the age of 13, and after 42 years of marriage, Mrs. Swan and her husband decided to get a divorce. Mrs. Swan's divorce attorney recommended Mr. Harlan to her for her bankruptcy proceedings. *(Ex. 2, p. 9).* Mrs. Swan decided to file bankruptcy after her ex-husband's gambling problem led the couple into debts of more than $200,000.00. *(Ex. 2, p. 6).*

Mrs. Swan understood that Mr. Harlan's fee would be $300 for the redemption and then $400 from her and $400 from her now ex-husband. *(Ex. 2, p. 12–13).* Mrs. Swan's deposition shows that she understood those fees to include everything about her bankruptcy. She explained that Mr. Harlan's office went through every document with her, but she does not remember nor understand everything that was explained to her about the bankruptcy process, her fee agreement or the specifics of everything that occurred. *(Ex. 2, p. 16–18).*

Mrs. Swan does not recall being told about alternative financing sources, but testified that she wanted to keep that vehicle because she had just bought it and she had to drive eighty miles a day for work. *(Ex. 2, p. 18).* Mrs. Swan did not know if she had been told about the other fees associated with the redemption; she did not know what all of the charges were in the note and security agreement; she understood that the law office would get $300 for the redemption, but did not know how that would occur. *(Ex. 2, p. 24–27).*

Mr. Harlan's legal assistant, April Watson, called 722 for Mrs. Swan. 722 then called Mrs. Swan back and told her that she had been approved. *(Ex. 2, p. 26).* 722 then sent the note and security agreement directly to Mrs. Swan, and she signed and returned it. Mrs. Swan did not know what

the vehicle condition report was, but she knew that her daughter had taken the car to Mr. Harlan's office for an appraisal. *(Ex. 2, p. 28)*. Mrs. Swan understood the interest rate on her loan is 24%, and even though she considered this high, she thought it necessary to keep her car.

The debtor explained that she had bought cars in the past, and though she is not educated, she is "not dumb by a long shot" and had no trouble understanding if a car deal was financially beneficial to her. *(Ex. 2, p. 39)*. She owed almost $18,000 to GMAC for the redemption of her 2003 Chevy Malibu, but she redeemed the vehicle for around $10,000 including all the fees and charges. *(Ex. 2, p. 41–42)*. Mrs. Swan considered the 722 a good deal because she got to keep her car and lower her payments. *(Ex. 2, p. 44)*. She was also considering paying off the 722 loan early with a loan through her bank at a later time, but she did not think she would have any trouble making the 722 monthly payments. ' *(Ex. 2, p. 45, 51)*.

Mrs. Swan testified that if the bankruptcy court found that she had paid too much for attorney fees, she would want the overage back, but generally she was satisfied with Mr. Harlan's representation, and had no complaints. *(Ex. 2, p. 29, 35)*.

Mr. Harlan testified that at the time of her bankruptcy petition, Mrs. Swan was going through an emotionally devastating divorce. She drove long distances to work, and she wanted to keep her fairly new and dependable car. Mrs. Swan's case was slightly unusual because no redemption decision was reached at the intake interview, and it was not until later that Mrs. Swan decided to redeem. Mr. Harlan explained that he did not recom-mend the "keep and pay" option without redeeming because of the uncertainty of the law in the Sixth Circuit and GMAC reluctance to proceed on that basis. According to Mr. Harlan's testimony, Mr. Harlan determined that Mrs. Swan had the ability to make the payments after pulling her credit report, conducting an initial valuation investigation based on the NADA, and searching her title. Mr. Harlan credibly testified that he believed the 722 redemption was a good option for Mrs. Swan. He estimates that the redemption in Mrs. Swan's case took about 3 hours of attorney time and 2.4 hours of staff time.

### 3. John Richard Shelby and Misty Diane Shelby

Mr. Shelby is a pipe-fitter for Local Union 572. He makes $17.55 per hour for a forty-hour work week, and has a high school diploma. He and his wife filed their chapter 7 bankruptcy after his wife had a complicated pregnancy and extensive doctor bills after their baby was born.[2] *(Ex. 3, p. 4–10)*. Mr. Shelby hired Mr. Harlan after finding his name in the phone book and asking around about Mr. Harlan. He explained that he expected his attorney to help him through bankruptcy and provide financial advice in their best interest during the case. *(Ex. 3, p. 11)*.

When reviewing his fee arrangement with Mr. Harlan, Mr. Shelby testified that he did not remember the specifics of what was and was not included in the $700 fee for their chapter 7 case. *(Ex. 3, p. 16–18)*. Mr. Shelby likewise did not remember what he and Mr. Harlan discussed about the $300 fee from the 722 redemption. *(Ex. 3, p. 18)*.

---

**2.** Mr. and Mrs. Shelby filed a chapter 7 bankruptcy in July of 2003. They allowed that case to be dismissed for failure to appear at their Meeting of Creditors when they realized that not all of the medical bills would be included. They filed the current, second chapter 7 petition in September, 2003.

Mr. Shelby first learned about 722 from Mr. Harlan when the Shelbys had their "intake" interview for the July 2003 bankruptcy filing. *(Ex. 3, p. 20–22)*. Mr. Shelby recalled Mr. Harlan explaining what 722 did, and although he does not remember the specifics, he believes Mr. Harlan told him both the advantages and disadvantages of using 722. *(Ex. 3, p. 24)*. Mr. Shelby told Mr. Harlan that he "had to" keep his truck, and he understood that Mr. Harlan would be paid $300 in attorney fees that would be added to his loan. In fact, Mr. Shelby stated he would have paid Mr. Harlan $300 directly if he had the money, but because he did not, he wanted it added to the loan. *(Ex. 3, p. 25)*.

Like the other debtors, Mr. Shelby indicated that although someone at Mr. Harlan's office went over all of the loan documentation, he does not recall what all of the fees and charges are for or to whom they were paid to. *(Ex. 3, p. 27)*. Mr. Shelby had no concern over the 24% interest rate because in his opinion a "tote the note" lot would have been the same thing. *(Ex. 3, p. 28)*. Mr. Shelby thought that if he had surrendered his vehicle, he would have to go to a tote the note lot or walk to work. *(Ex. 3, p. 29)*.

Mrs. Shelby handled all of the 722 paperwork, and Mr. Shelby was therefore unaware of the specifics of the transaction. She stated that they hired Mr. Harlan because everybody she talked to said that Mr. Harlan "was a great attorney." *(Ex. 4, p. 9)*. She expected an attorney to be honest with them, and she feels they got that from Mr. Harlan. *(Ex. 4, p. 10)*. They agreed to pay Mr. Harlan $700 for their bankruptcy, and that included all services. She understood that in addition to that amount, $300 would be paid out of the loan they took out from 722 for the redemption. *(Ex. 4, p. 12–13)*.

As to the specifics of the 722 transaction, Mrs. Shelby testified that Mr. Harlan explained about the redemption, and how it could lower the overall payments on their 2002 Dodge Ram truck. *(Ex. 4, p. 15)*. Mrs. Shelby stated that Mr. Harlan discussed such options as letting the truck go, refinancing with another lending institution, and 722. The Shelbys decided refinancing was not an option because of their credit; surrender was not feasible; and that the best option was to lower the payments on the truck. *(Ex. 4, p. 16)*. Mr. Harlan explained the entire 722 loan process, including the valuation of the truck, the fees and charges involved, and how the process worked. *(Ex. 4, p. 17)*.

Mrs. Shelby agreed with the valuation of $11,600 that Mr. Harlan assigned to the truck based on the Blue Book value. *(Ex. 4, p. 21)*. 722 then discussed valuation with Mrs. Shelby when she called them. Once the note and security agreement were prepared, the debtors signed them, but Mrs. Shelby could not recall whether or not she and Mr. Harlan reviewed all of the fees and charges. She testified that they were mostly just concerned with how much money would be saved by the transaction. *(Ex. 4, p. 24)*.

Mrs. Shelby stated that she was aware that a vehicle redemption would be an additional fee, and knew that the redemption of her husband's wedding band was included in Mr. Harlan's basic bankruptcy fee. *(Ex. 4, p. 29)*. She explained that because she had worked at Jim Reed, she was familiar with many of the fees and charges for automotive dealers and did not consider them a factor in the refinancing. She and her husband felt that if they had questions concerning the redemption process or 722, Mr. Harlan would have answered them. In Mrs. Shelby's opinion, Mr. Harlan was completely honest, and she would recommend him to anyone. She

and her husband were satisfied with Mr. Harlan's representation. *(Ex. 4, p. 31).*

Mr. Harlan testified that because the Shelbys had to dismiss and refile their bankruptcy due to the medical bills, he gave them credit for fees paid in the first case. In essence, he did the work of two bankruptcy filings for the price of one. In this case, Mr. Harlan explained that there was an objection filed to the 722 redemption motion. He spent time negotiating between the secured creditor and the debtors to reach an agreed resolution for the redemption. According to Mr. Harlan, there were other complications in this case. Mr. Shelby got laid off, and Mr. Harlan had to renegotiate with 722 because they were concerned about his unemployment status. Although it all worked out, Mr. Harlan testified that it was "tough" because the discharge date was fast approaching.

Mr. Harlan estimates that he spent 3.55 hours of attorney time and his staff spent about 4.3 hours accomplishing a successful redemption in the Shelbys case.

### III. Issues

The issues in this case are as follows:

(1) Whether the receipt of the attorney fees through 722 created a conflict of interest which inappropriately influenced the attorney's advice to redeem vehicles in these cases; and

(2) Whether the attorney fees of $300 for vehicle redemptions in each of these cases is excessive.

---

**3.** Federal Rules of Bankruptcy Procedure 2017 implements section 329. It provides as follows:

*Rule 2017. Examination of Debtor's Transactions with Debtor's Attorney*
*(a) Payment or transfer to attorney before order for relief.* On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any

### IV. Discussion

#### A. Generally

█ Pursuant to 11 U.S.C. § 329, the court has the authority to examine fees. That section provides:

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) the estate, if the property transferred—

(A) would have been property of the estate: or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or

(2) the entity that made such payment.

11 U.S.C. § 329.[3] The authority of the Bankruptcy Court to review compensation

---

transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor or before entry of the order for relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive.
*(b) Payment or transfer to attorney after order for relief.* On motion by the debtor, the United States trustee, or on the court's

is a traditional power of the court and is essential to avoid overreaching by a debtor's attorney. *Matter of Hunt* 59 B.R. 842, 844 (Bankr.N.D.Ohio 1986). Thus, even in cases where services performed are not appropriately the subject of a fee application under Section 330, counsel nonetheless has a duty to disclose to the court, under 11 U.S.C. § 329, the amount of compensation paid or agreed to be paid in connection with the bankruptcy proceedings. Upon the request of a party in interest, or upon its own initiative, the court will examine the fee arrangement between the parties and may order the return of any such payment or cancel any such agreement for payment if the compensation exceeds the reasonable value of such services. *11 U.S.C. § 329(b); FED. R.BANKR.P. 2017(b).*

Upon the motion of the UST, the court, therefore, must review the redemption fees charged by Mr. Harlan, first for a conflict of interest, and secondly as excessive.

### B. Conflict of Interest

The United States Trustee argues that an attorney should not receive fees from a third party, especially when the third party is also receiving the benefit of the transaction. The UST's conflict of interest argument is two-fold: (1) it is a per se conflict of interest as an ethical violation; and/or (2) Mr. Harlan's fees are a conflict of interest under the statutory provisions of the United States Bankruptcy Code. Mr. Harlan contends that there is no conflict of interest at all, either ethically or statutorily and therefore, no basis for disgorgement.

### 1. Ethical Conflict of Interest

■■■■■ This is not the first time the UST has raised this issue in this district. Judge Marian Harrison discussed the conflict of interest issue as an ethical violation in this exact context in her decision of *In re James,* Case No. 103–03648, Docket No. 43 (Jan. 21, 2004). In that case, the UST had filed a motion seeking disgorgement of Mr. Harlan's attorney fees paid in conjunction with redemptions accomplished with 722 Redemption Funding, Inc.'s loans. Although Mr. Harlan did not present proof at trial, Judge Harrison ruled as follows on the same conflict of interest arguments as are presented here:

> Initially, the United States Trustee asserts that receiving payments from 722 Redemption created a conflict of interest for Mr. Harlan.
>
> When a trustee or debtor-in-possession files an application to employ a professional, the standards regarding conflict of interest and disinterestedness, as set forth in 11 U.S.C. § 327(a), are strictly applied. These standards, however, do not apply to the employment of counsel for the debtor in a Chapter 7 proceeding. Instead, the only applicable standards of which this Court is aware of are those set forth in the Tennessee Supreme Court's Code of Professional Conduct.
>
> The Code of Professional Conduct in Tenn. S.Ct. R. 8 provides guidance in determining an attorney's obligations to his or her client under various circumstances. *Lazy Seven Coal Sales, Inc. v. Stone & Hinds, P.C.,* 813 S.W.2d 400, 405 (Tenn.1991). The Code's disciplinary rules are mandatory, and the ethical

own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property, or any agreement therefor, by the debtor to an attorney after entry of an order for relief

in a case under the Code is excessive, whether the payment or transfer is made or is to be made directly or indirectly, if the payment, transfer, or agreement therefor is for services in any way related to the case.

considerations are aspirational and represent the objectives toward which every attorney should strive. Tenn. S.Ct. R. 8, Preliminary Statement.

Lawyers have a fiduciary relationship with their clients. *Alexander v. Inman*, 974 S.W.2d 689, 694 (Tenn.1998). The level of good faith required is significantly higher than that required in other business transactions where the parties are dealing at arm's length. *Id.* at 693. The client must be able to trust the attorney to deal fairly at all times, including during the negotiation of the attorney's terms of employment. *Cummings v. Patterson*, 59 Tenn.App. 536, 541, 442 S.W.2d 640, 643 (1968).

Attorneys are obligated to exercise their utmost good faith in the discharge of their duties to their client. *Starks v. Browning*, 20 S.W.3d 645, 650 (Tenn. App.1999) (citations omitted). Accordingly, lawyers exercise independent judgment on their clients' behalf. Tenn. S.Ct. R. 8, Canon 5. Lawyers must also avoid impermissible conflicts of interest. *State v. Locust*, 914 S.W.2d 554, 557 (Tenn.Crim.App.1995); Restatement (Third) of the Law Governing Lawyers § 16(3) (2000). A conflict of interest arises whenever there is a substantial risk that a lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another client, a former client, or a third person. Restatement (Third) of the Law Governing Lawyers § 121 (2000); *see, e.g., State v. Tate*, 925 S.W.2d 548, 552–53 (Tenn. Crim.App.1995) (holding that a conflict of interest arises when a lawyer's regard for the duty owed to one client tends to lead to disregard of the duty owed to another client).

Although accepting fees from a third-party financing company could create a conflict of interest risk, the evidence in these cases does not support such a finding. Based on the proof, where none of the debtors objected to the fees, it would be impetuous to find that the risk of conflict is substantial or that Mr. Harlan's interest in attorney fees would affect his representation of debtors in a material and adverse way. Accordingly, the Court finds that there has been no showing of a conflict of interest.

*Id.* Judge Harrison concluded that the proof in her particular case did not support a finding of a conflict of interest. Thus on an ad hoc basis, under the general standards provided by The Code of Professional Conduct, the court must determine whether any disciplinary rules are violated by Mr. Harlan in these cases.

Effective March 1, 2003, the Code of Professional Responsibility was replaced by the Tennessee Rules of Professional Conduct, likewise codified at Tennessee Supreme Court Rule 8. At the time Mr. Harlan accepted employment on these matters, the ethical conduct of Tennessee lawyers was governed by the new Professional Conduct Code.[4] Rule 1.7 governing conflicts of interest provides in relevant part as follows.:

**Rule 1.7   Conflict of Interest:   General Rule**

.      .      .      .      .

**(b)** A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

---

**4.** The Ray case was filed on August 20, 2003; the Swan case was filed on July 16, 2003, and the Shelby case was filed on September 16, 2003.

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents in writing after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

*Tenn. Sup.Ct. R. 8, RPC 1.7(b) (2003).* In the notes to the rule, the drafters contemplated lawyers being paid by a source other than the client and the rule provides as follows:

A lawyer may be paid from a source other than the client if the client is informed of that fact and consents and if the arrangement does not compromise the lawyer's duty of loyalty to the client. See RPC 1.8(f). For example, when an insurer and its insured have conflicting interests in a matter arising from a liability insurance agreement, and the insurer is required to provide special counsel for the insured, the arrangement should assure the special counsel's professional independence. So also, when a corporation and its directors or employees are involved in a controversy in which they have conflicting interests, the corporation may provide funds for separate legal representation of the directors or employees if the clients consent after consultation and the arrangement ensures the lawyer's professional independence.

*Tenn. Sup.Ct. R. 8, RPC 1.7(b), Comment 14 (2003).* RPC 1.8(f) provides that:

*(f)* A lawyer shall not accept compensation or direction from one other than the client unless:

(1) the client consents after consultation;

(2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and

(3) information relating to representation of a client is protected as required by Rule 1.6.

*Tenn. Sup.Ct. R. 8, RPC 1.8(f) (2003).*[5] The conflict, according to the UST, is between Mr. Harlan's loyalties to the unbiased representation of the debtors and his loyalties to 722 to utilize their services to obtain his attorney fees.

The UST does not in any way attack or impugn 722 as a business, and in fact, acknowledged that 722 is one of the options available to debtors with limited options as to transportation needs during a bankruptcy. Instead, the UST's objection concerns Mr. Harlan's potentially compromised representation of the debtors. In support of the UST's motion to disgorge, the UST relied, in part, upon the expert testimony of two highly qualified and experienced bankruptcy attorneys with large debtor practices. Maria Salas [6] and James

---

**5.** According to *Tenn. Sup.Ct. R. 8, RPC 1.7(b), Comment 14 (2003),* "A lawyer may be paid from a source other than the client if the client is informed of that fact and consents and if the arrangement does not compromise the lawyer's duty of loyalty to the client." This Official Comment is the closest analogy the court can find to the UST's perceived ethical conflict of interest by Mr. Harlan. It is not an actual benchmark, however, because the funds being used to pay Mr. Harlan are

not, in fact being paid by a third party—the funds are the debtor's money borrowed from 722 and paid at the closing of the loan.

**6.** Ms. Salas has been practicing consumer bankruptcy for twelve years. The parties stipulated to her qualifications as an expert, and as the court noted at the hearing, if she is not an expert, then the court is unsure who would be.

Flexer [7] both testified concerning the conflict of interest issue, and gave their opinions about 722.

Ms. Salas testified that although she has had a few clients utilize 722, she does not approve of or recommend them as an option for her clients. Ms. Salas explained that her ethical objection is that there is an appearance of impropriety and she does not think that the amount of attorney fees that are paid are connected to the actual redemption. In other words, a $200 fee, according to Ms. Salas, is too high for an uncontested redemption, and too low for a contested and litigated redemption. Although Ms. Salas stated that she was ethically opposed to 722's payment of attorney fees, she did not find Mr. Harlan or others who used 722 to be unethical per se. In her estimation, it was a "grey" area on an ethics call and not as clear cut as black and white.

Ms. Salas examined all of the options available to the debtors in all three cases. She testified that there are really four options available to deal with a chapter 7 consumer debtor's transportation needs: (1) reaffirmation, which is recommended when the numbers make sense for the debtor's budget; (2) maintain payments, which is being recommended more frequently by Ms. Salas to allow debtors to continue payments as if bankruptcy had not occurred; (3) redemption, which is advised if the debt has been paid down and there is a low value for the car—this option is normally not available on newer cars or non-converted cases where the car is new; and (4) surrender of the vehicle in which case Ms. Salas suggests alternative transportation ideas such as certain car lots recognizing that the options are not good, but there are options. For example, in the *Ray* case, Ms. Salas explained that she would have explained each of these options in detail. She questioned whether redemption was the correct option for Ms. Ray since the debtor's car payment is just slightly less than her chapter 13 payment which the debtor considered too high. She admitted however, that Ms. Ray's options were not good, and oftentimes clients have to do whatever they can to get or keep a car.

Mr. Flexer testified that he had clients who have used 722 in the past for redemptions. He explained that he has received attorney fees for 722 redemptions, but changed his policy, and no longer receives attorney fees from 722. Mr. Flexer now considers all redemption motions, whether for personal property or vehicles, even if it involves 722, to be within his flat rate charge for a typical chapter 7 consumer bankruptcy. Mr. Flexer does acknowledge, however, that there is more involved with a vehicle redemption than a personal property redemption.

Mr. Flexer's approach to the transportation needs of chapter 7 consumer debtors is education of all possible options with an emphasis on trying to steer the debtors to surrender of a vehicle in favor of a $2,000—$5,000 dependable replacement. Mr. Flexer, like Ms. Salas, did review the *Ray*, *Swan* and *Shelby* files, and did say that he would have considered redemption as an option for all of these debtors. In the *Ray* case, Mr. Flexer indicated that redemption was probably her best option if she could borrow money from a relative or even if she had to rely on a company like 722.

---

7. Mr. Flexer is likewise an experienced consumer bankruptcy attorney. He has practiced for the last twenty years primarily focused on consumer bankruptcy cases involving chapter 7 and chapter 13. He is also, by agreement of the parties, and the court agrees, an expert.

As to Mr. Flexer's ethical objections to 722, he testified that a client must be fully aware on the front end that they are paying extra for a vehicle redemption. The client must be fully aware that the client is borrowing additional funds to pay the attorney fees. Mr. Flexer, like Ms. Salas, stated that he personally, has some reservations about the transactions involving 722, but he did not characterize Mr. Harlan's use of 722 as unethical.

The third expert who testified, by deposition, was Michael Combs.[8] Mr. Combs indicated in his deposition that he normally did not charge for personal property redemptions but does charge for vehicle redemptions. He charges $200 and that is based on a quick estimate of the time he would normally spend on a redemption motion. *(Ex. 32, p. 6)*. He explained that redemptions in chapter 7 normally arise in two contexts: (1) a conversion from chapter 13 where there is an arrearage, and (2) when the debtor is "upside down" on the car note in an original 7. Mr. Combs testified that normally his clients call 722 because there are no other funds to borrow from. He estimated that a normal vehicle redemption takes about 2 hours of attorney time. *(Ex. 32, p. 11)*.

As to the conflict of interest issue, Mr. Combs testified that he does not perceive any conflict of interest in this situation at all. *(Ex. 32, p. 13)*. Mr. Combs tells clients about 722, a sort of de facto recommendation, but the debtors are the ones who obtain the numbers from 722 and decide whether or not to use them. *(Ex. 32, p. 22)*. He does not represent 722; he represents the debtors. Mr. Combs explained that he discusses all options with his clients, and if they choose redemption,

he sees 722 as a potential benefit for debtors. *(Ex. 32, p. 17)*. Debtors get to retain a vehicle they are presumably satisfied with; they are getting it for a reasonable price; and they never have interrupted transportation needs. *(Ex. 32, p. 17)*. According to Mr. Combs, the options for debtors are limited if they are not going to get redemption financing from a relative, from an alternative source, or from 722. Mr. Combs suggested that they can go to tote-the-note lots for cars. Disadvantages associated with this choice, however, are cars with no warranties, sometimes questionable dealerships and typically unreliable cars. Once a debtor receives a discharge, he/she can get a new car, but usually start off upside down on the note. Mr. Combs testified that he did not find any ethical dilemma in his clients using 722 and his $200 attorney fee being paid from the funds borrowed from 722.

■ From this proof, the UST argues that Mr. Harlan's conflict of interest should negate his fee received from his clients. The court disagrees.

Clients must be able to trust the attorney to deal fairly at all times, including during the negotiation of the attorney's terms of employment. *Cummings v. Patterson*, 59 Tenn.App. 536, 442 S.W.2d 640, 643 (1968). In each and every case, the debtors testified that they were aware of the extra money borrowed to pay Mr. Harlan's fees, and that they were satisfied with Mr. Harlan's representation. In actuality, they were more than satisfied. Collectively, the debtors referred to Mr. Harlan as an honest, well-liked attorney. Mrs. Shelby went so far as to say she would recommend him to anyone needing bankruptcy representation.

8. Mr. Combs has been filing consumer bankruptcy cases since 1982 and files between 400—450 annually. He estimated about 55% of his filings are chapter 13 cases and about 47% were chapter 7 cases. Mr. Combs is also unquestionably an expert witness on consumer bankruptcy issues.

Mr. Harlan's representation was not only fully vindicated by his clients' testimony, but his own testimony at the hearing was credible and beyond reproach. Mr. Harlan's honesty, as portrayed by his clients, was equally apparent as he testified to the events surrounding each of these redemptions. Also very convincing to the court that Mr. Harlan's judgment was in no way affected by a financial incentive, were the results he achieved by the redemptions in each of these three cases:

| Shelby Case | Original Loan | 722 Loan | Savings |
| --- | --- | --- | --- |
| Amount of Debt | $24,000.00 | $13,995.00 | $10,005.00 |
| Term of Loan | 63 months | 60 months | 3 months |
| Monthly Payment | $469 | $410 | $ 58.91 |
| Total Cost of Loan | $29,574.00 | $24,605.00 | $ 4,969.00 |
| Ray Case | Original Loan | 722 Loan | Savings |
| Amount of Debt | $12,956.00 (at conversion from 13) | $3,970.00 | $ 8,986.00 |
| Term of Loan | 48 months (original term) | 18 months | 30 months |
| Monthly Payment | $380 (per client) | $ 278.81 | $ 101.19 |
| Total Cost of Loan | $18,240.00 | $5,018.58 | $13,222.00 |
| Swan Case | Original Loan | 722 Loan | Savings |
| Amount of Debt | $17,000.00 | $ 7,570.00 | $9,430.00 |
| Term of Loan | 59 months | 60 months | none |
| Monthly Payment | $ 369.00 | $ 225.25 | $ 143.75 |
| Total Cost of Loan | $21,771.00 | $13,525.00 | $8,256.00 |

The UST argued that this court should follow the court in *In re Miller*, 312 B.R. 626 (Bankr.S.D.Ohio 2004) in finding that a conflict of interest does exist. In that case, the UST asked the bankruptcy court to examine the fees paid to a debtor's attorney. The debtor's attorney did not appear at the hearing, and Judge Vincent Aug decided the conflict of interest based only upon the proof presented by the UST. The court found that generally a debtor should not receive fees from a third party when the third party is also benefitting from the transaction. *Id.* at 628. The court concluded, based only upon the limited evidence before the court, that:

the structure of this transaction was designed to keep the Debtors unaware that they were paying anything for the redemption work. It may or may not have been anyone's intention to trick the Debtors, but the logical inferences to be drawn from these facts point to a comfortable subterfuge.

*Miller*, 312 B.R. at 629. *Miller* is entirely distinguishable given the limited proof presented, Judge Aug's need to *infer* a "comfortable subterfuge," and the need of the court to examine the unique facts of every case. In these cases, however, the court has abundant proof supporting the sanctity of Mr. Harlan's representation undisturbed by a conflict of interest or financial pressure.[9]

9. The UST also submitted a post-trial brief directing the court's attention to Judge Jacqueline Cox's recent opinion, *In re Griffin*, 313 B.R. 757 (Bankr.N.D.Ill.2004). In that decision, Judge Cox denied a supplemental application for compensation submitted by the debtor's attorney in connection with a vehicle redemption. The debtors redeemed

Like Judge Harrison, this court finds that "where none of the debtors objected to the fees, it would be impetuous to find that the risk of conflict is substantial or that Mr. Harlan's interest in attorney fees would affect his representation of debtors in a material and adverse way." *In re James*, Case No. 103–03648, Docket No. 43 (Jan. 21, 2004). While the visceral reaction of impropriety might lead an independent observer to question these transactions, delving into the relationships of the parties fully exonerates any conflict of interest allegations. A look at just some of the supporting proof puts at ease any notions of conflict of interest. For example:

(1) The debtors all testified to their awareness of the $300 fee charged by Mr. Harlan;

(2) the debtors all expressed their desire to keep their current vehicles;

(3) all of the debtors saved on their monthly payments, total costs on the loans, and lessened the amount of their overall secured loans;

(4) these debtors were completely satisfied by Mr. Harlan's representation;

(5) they understood that they were borrowing additional funds to pay Mr. Harlan's attorney fees; and

(6) the debtors all indicated they understood that 722 was an independent

entity not associated with Mr. Harlan.

■■■ Based on all of the foregoing, the court finds no ethical conflict of interest. The court therefore overrules the UST's motion for disgorgement of fees on this basis.[10]

### 2. Statutory Conflict of Interest

■■■■■ The UST also argued at trial that there was a statutory conflict of interest under the United States Bankruptcy Code. The court disagrees. Unlike chapter 11 cases where the debtor in possession is a fiduciary and its counsel must be "disinterested" within the meaning of section 101(14), in chapter 7 cases the attorney representing the debtor need not be "disinterested." *Accord, e.g., In re Pro-Snax Distributors, Inc.*, 212 B.R. 834 (N.D.Tex.1997); *Matter of Leitner*, 221 B.R. 502, 504 (Bankr.D.Neb.1998); *In re Hoffman*, 53 B.R. 564 (Bankr.W.D.Ark. 1985). Section 327(a) applies the "disinterestedness" requirement to professionals engaged by a bankruptcy trustee. By virtue of section 1107(a), a chapter 11 debtor in possession is treated as a bankruptcy trustee. *See In re First Jersey Securities, Inc.*, 180 F.3d 504, 508 (3rd Cir.1999); the chapter 7 debtor is not.

---

using 722 Redemption Funding, Inc., and the court found that the attorney could not be compensated from estate property, and could not collect the fee from the debtors because the claim resulting from the motion to redeem was a pre-petition contract claim. Further, the court found disclosure by the attorney to be defective under the Code, and ordered disgorgement. The court also addressed concerns that the fee sought did not comply with a lodestar analysis. The court did consider *Griffin* in deciding this opinion, but did not find it persuasive authority when applied to the specific facts of this case.

10. Even assuming that there was some conflict, which the court finds there was not, a waiver of that conflict by the client obviates the conflict of interest inquiry. Before an attorney who maintains an actual conflict of interest in his or her representation of a client is allowed to continue his or her representation, there must be (1) full disclosure of the conflict of interest, and (2) an effective waiver by the client. This court finds that the debtors did in fact have full disclosure and by their conduct and lack of objections impliedly waived any potential conflict. The court reiterates, however, that no actual conflict of interest existed in these cases.

■ The code makes clear that certain types of "conflicts" are not only tolerated in bankruptcy, but anticipated and therefore made statutorily permissible. For example, section 327(c) expressly permits at least one type of conflict:

(c) In a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

*11 U.S.C. § 327(c)*. In this case, the court finds no statutory conflict of interest. The Code is willing to overlook an attorney's representation of the debtor and a creditor absent an objection where there is no actual conflict. Here the relationship between Mr. Harlan and 722 is even more tenuous. The employment and fee agreements are contracts between Mr. Harlan and the client, and 722 is not in privity. Further, if Mr. Harlan's fee of $300 is not paid at closing, Mr. Harlan's recourse is against the debtors under the fee contract, not against 722. Mr. Harlan represents only the debtors, not 722. Simply put, Mr. Harlan was laboring under no conflict of interest. The interests here do not conflict; they coincide.

Accordingly, the court finds that there is no statutory conflict of interest that would warrant disgorgement of Mr. Harlan's fees. The court therefore DENIES the UST's motion for disgorgement based on its argument of conflict of interest.

### C. Reasonableness of the Fees

Lastly, the UST contends that even if there is no conflict of interest, the fees charged by Mr. Harlan for these "routine" services are excessive. The UST argues that the redemption motions were "boilerplate" chapter 7 pleadings; no novel or difficult issues were presented; and that most of the tasks could be handled by Mr. Harlan's office staff. Mr. Harlan's $300 fee is not reasonable. According to the UST, the evidence is uncontradicted that the debtors received less than comparably skilled attorneys provide for a standard chapter 7 fee. The UST relies upon the expert testimony of Maria Salas and James Flexer to support the objection to Mr. Harlan's fees.

Mr. Harlan disagrees with the UST's characterization. He contends that the unique circumstances of each redemption case fully supports his fees, and furthermore, that each of the debtors received adequate and fair representation that justified the charging of the $300 fees to complete their redemptions. Mr. Harlan relies upon his own testimony, the results achieved by the redemption as shown in Trial Exhibit A, the testimony of the debtors evidencing their complete satisfaction of the representation received, and the expert testimony of Michael Combs.

■ Pursuant to 11 U.S.C. § 329(b), the court has the authority to examine the "reasonableness" of fees. *See* 11 U.S.C. § 329(b). Thus, if Mr. Harlan's $300 fee exceeds the reasonable value of his services, this court may order disgorgement to the extent excessive.

Maria Salas and James Flexer testified as follows concerning the amount they generally charged in chapter 7 cases:

| Attorney | Standard Chapter 7 Fee | Services Included in Chapter 7 Fee | Services Not Included | Hourly Rate | Amount of Time to Complete a Routine Uncontested Redemption |
|---|---|---|---|---|---|
| **Maria Salas** | $650 | All uncontested matters including redemptions | Adversaries, all contested litigation *may charge for redemption that requires coming to court to resolve | $175 for Salas $200 for partner, Ed Rothschild $70 paralegal | 20 minutes of attorney time 30 minutes staff time ($95 for redemption at Salas's hourly rate) |
| **James Flexer** | $466 | All uncontested matters including redemptions, contested or not | Contested Matters such as adversaries and in court litigation | $150 to $175 depending upon the complexity of situation | 1 ½ hours is not unreasonable for even the simplest redemption and for contested, more time ($225 for redemption at $150/ hr. for 1 ½ hours) |

Ms. Salas also explained that in the chapter 7 context, it is widely known that different lawyers and firms charge different rates for a standard chapter 7 case. The "bundle of services" included in the standard chapter 7 fee varies from attorney to attorney. This is further supported by Mr. Combs' testimony. Mr. Combs charges the following rates:

| Attorney | Standard Chapter 7 Fee | Services Included in Chapter 7 Fee | Services Not Included | Hourly Rate | Amount of Time to Complete a Routine Uncontested Redemption |
|---|---|---|---|---|---|
| **Michael Combs** | $516 | All uncontested matters including personal property redemptions, contested or not | All contested matters, vehicle redemptions are $200 flat rate | $200 (always bills by flat rate, but if has to justify fees, uses $200 per hour) | 2 hours on a typical vehicle redemption of attorney time, staff time limited to client contacts ($400 for typical redemption at Combs' hourly rate for 2 hours) |

Ms. Salas explained that in chapter 13 cases, there was a general consensus among the chapter 13 debtor-attorneys, the chapter 13 trustee, and the United States Trustee to charge a certain amount for chapter 13 representation. The two generally accepted rates in chapter 13 debtor practice are $1,700.00 for non-certified bankruptcy consumer specialists and $2,000.00 for certified consumer bankruptcy specialists.[11] These rates included all of the same services provided by the debtors' attorneys in chapter 13 cases.

In contrast, the proof at trial indicated that the market determines the rates in chapter 7, and practitioners charge various rates for differing bundles of services. This is apparent from the testimony of the four bankruptcy attorneys that testified in these cases. Mr. Combs charges $516 as a flat rate, and includes all services, but

**11.** Ms. Salas testified that these rates are the generally accepted rates that the UST will not object to as being too high. The court found this testimony unsettling at best that these "minimum" fees are being informally agreed to between these parties.

charges extra for vehicle redemptions and would charge extra if he had to prepare a reaffirmation agreement. Ms. Salas charges $650 for a typical chapter 7 case, and this fee includes all uncontested chapter 7 services including uncontested vehicle redemptions. Mr. Harlan charges $600 for typical chapter 7 cases, but this fee does not include all vehicle redemptions. Finally, Mr. Flexer charges $466 for chapter 7 cases, and this fee does include all redemptions. The standard chapter 7 fee is anything but standard in its amount or as to what services are covered.

Because Mr. Harlan does not maintain time records, in his testimony, he recounted what he had done with each debtor's redemption, and then estimated the time spent by him and his staff on each redemption. His time estimates were as follows:

| | Attorney Time | Staff Time | Compensation for Attorney's Time (Total) |
|---|---|---|---|
| *Ray Case* | 3.8 hours | 2.7 hours | $950 |
| *Swan Case* | 3 hours | 2.4 hours | $750 |
| *Shelby Case* | 3.55 hours | 4.38 hours | $887.50 |

Given Mr. Harlan's thorough review of the unique facts of each of these redemptions, and Mr. Harlan's credibility as a witness, the court finds that these time estimates fall well within the range of reasonableness for the work involved. Each case presented some novel twist and was more than a completely uncontested redemption. Ms. Ray's case was converted from a 13 and there were valuation issues. In the Swans case, Mrs. Swan was undergoing a painful divorce, drove long distances to work, and did not decide to redeem at her initial intake interview. Finally, in the Shelbys case, an objection was filed to the redemption motion and there were also issues with Mr. Shelby's employment.

This court has discussed the standard of reasonableness in the attorney fee context on a prior occasion:

Congress recognized the increasingly sophisticated nature of bankruptcy cases. To efficiently resolve bankruptcy cases, an attorney must know commercial law, contract law, tax law, and oftentimes employment law, pension law, and securities law. The proficient bankruptcy attorney must be an able negotiator and trial lawyer, should negotiations fail.

In this circuit, lodestar analysis regulates compensation of bankruptcy professionals. *Boddy v. United States Bankruptcy Court,* 950 F.2d 334, 334 (6th Cir.1991). The lodestar method directs a court to multiply the reasonable hourly rate by the hours reasonably expended in performance of actual and necessary services. *Id.* A reasonable hourly rate should be determined based on "the amount involved, customary fees, the level of skill required, reputation of the applicant, time limitation, whether the fee is contingent or fixed, and the case's undesirable aspects, if any." *In re Crabtree,* 45 B.R. 463 (Bankr.E.D.Tenn.1984); *In re Boddy,* 950 F.2d at 337; *In re Southern Industrial Banking Corp.,* 41 B.R. 606 (Bankr. E.D.Tenn.1984).

*In re Holder,* 207 B.R. 574, 580 –581 (Bankr.M.D.Tenn.1997). In determining the reasonableness of Mr. Harlan's fees, the court considered: (1) Mr. Harlan's experience (21 years as an attorney, doing exclusively bankruptcy work since 1986); (2) the hourly rate of attorneys with similar clients and experience (Harlan $250. Combs $200, Salas $175, Rothschild $200, Flexer $150–$175); (3) the skill of Mr.

Harlan and quality of his legal services (all clients were satisfied with representation and would refer others to him); (4) the difficulty associated with the work performed (Mr. Harlan provided credible testimony about the novelty and uniqueness of each of these debtors' situations); and (5) whether Mr. Harlan distributed the work to minimize costs (Mr. Harlan's estimates of his time and his staff's time in each redemption was reasonable and not unduly weighted toward attorney time versus staff time).

Under the loadestar analysis, it is evident that even in the most routine of redemptions, the testimony varied as to what constitutes a reasonable amount of time. (Ms. Salas' testimony of 20 minutes of attorney time and 30 minutes of staff time to Mr. Combs' testimony of 2 hours of attorney time). The time estimates provided by Mr. Harlan indicate that he was not overcompensated by the $300 fee, but was in fact undercompensated. Mr. Harlan's hourly rate multiplied by his attorney time alone left him undercompensated. *See Time Estimates Table infra.* As testified to by Mr. Combs and Mr. Harlan, however, this is the nature of the flat fee. In some cases, $300 would cover the amount of work performed, but in cases such as these, the compensation fell short of the lodestar.

Given all the proof in this case, the court finds Mr. Harlan has ably carried his burden to demonstrate the reasonableness of the fees charged for the redemptions. Accordingly, this court finds no fees charged that reasonably exceeded the value of the services provided. The court therefore, DENIES the UST's motion to disgorge Mr. Harlan's fees as unreasonable.

### V. Conclusions

For all of the foregoing reasons, the court hereby DENIES the United States Trustee's Motion to Disgorge Fees. The court finds no conflict of interest, neither ethically nor statutorily. Furthermore, the court finds that Mr. Harlan has shown by a preponderance of the evidence that the $300 fee for the redemption services in these cases is reasonable. A separate order, not inconsistent with this Memorandum, shall issue contemporaneously herewith.

It is therefore so ORDERED.