In re MUSHROOM TRANSPORTA-
TION CO., INC. et al., Debtors.

No. 85–02575bf.

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 17, 2013.

Pace Reich, Pace Reich P.C., Elkins Park, PA, for Debtor.

Gary F. Seitz, Rawle & Henderson L.L.P., Philadelphia, PA, George R. Tsakataras, Willington, DE, for Trustee.

## MEMORANDUM

BRUCE FOX, Bankruptcy Judge.

Jennings Sigmond, P.C. has filed a final fee application pursuant to 11 U.S.C. § 330(a) in the above-captioned case. Jennings, as the successor in interest to Sagot, Jennings & Sigmond, requests an award of compensation as special counsel to the chapter 7 trustee in the amount of $706,639.00 for services rendered, plus $93,024.84 for reimbursement of expenses. These services and expenses were rendered and incurred between June 1993 and May 2012. Jennings also seeks a final allowance for $17,181.00 in interim fees awarded under 11 U.S.C. § 331 for the period from Aug 10, 1992 until May 31, 1993.

Pincus Verlin Hahn & Reich PC filed an objection to this application, and requested an evidentiary hearing pursuant to Local Bankruptcy Rule 2016–1(d), asserting disputed issues of fact. Pincus maintains that Jennings should receive no award under section 330(a) because it held a conflict of interest when it represented the chapter 7 trustee as special counsel. Alternatively, Pincus contends that the fee allowed should be greatly reduced or denied, as Jennings's representation allegedly was of little or no benefit to the chapter 7 estate, and the services rendered were duplicative and unnecessary.

An evidentiary hearing was held, at which time the chapter 7 trustee reported that he reached a settlement with Jennings to significantly reduce the amount awarded special counsel under section 330(a). The United States trustee, whose counsel was present at the hearing, supported this settlement. Pincus did not. In return, the trustee challenged Pincus's standing to object to his agreement.

I resolve all of these issues as follows.

I.

A.

On September 28, 2012, the chapter 7 trustee, Jeoffrey L. Burtch, filed a status report detailing the funds collected by the estate, the source of those funds, the disbursements made, as well as the various administration claims already awarded or anticipated in this bankruptcy case. As the Mushroom bankruptcy case had been converted from chapter 11 to chapter 7 in December 1990, the trustee separately listed chapter 7 administrative expenses and chapter 11 administrative expenses as defined by 11 U.S.C. § 503(b). *See generally* 11 U.S.C. § 726 (granting post-conversion administrative expenses a priority over pre-conversion administrative expenses). The trustee's report disclosed funds on hand in the chapter 7 estate totaling about $663,000,[1] and chapter 7 administrative expenses were estimated to be approximately $292,000.[2] *See* new docket entry # 47.[3] To the extent that Jennings is allowed compensation under section 330(a), such an allowance would also be a chapter 7 administrative expense. *See* 11 U.S.C. § 503(b)(2). Obviously, if Jennings were allowed the full amount of its fee application—more than $800,000—the trustee would be unable to pay all allowed chapter 7 administrative expenses in full. Such

expenses would be paid *pro rata*. *See, e.g., Specker Motor Sales Co. v. Eisen,* 393 F.3d 659, 662 (6th Cir.2004). Moreover, were the trustee unable to pay all chapter 7 administrative expenses in full, he might attempt to recover certain chapter 11 administrative expenses previously awarded. *See id.,* 393 F.3d at 662–63; *In re Chute,* 235 B.R. 700 (Bankr.D.Mass.1999).

At the hearing on Jennings's fee application, counsel for the chapter 7 trustee announced that the trustee had reached an agreement with Jennings that resolved all objections that the trustee would have made to the instant fee application. Under this agreement, Jennings agreed to reduce its requested final allowance so that all other chapter 7 administrative expenses would be paid in full.[4] The trustee and Jennings estimated that Jennings would be allowed no more than $367,000 in fees and costs, representing a voluntary disallowance of about 55% of the fees and costs requested in the instant application. In addition, the chapter 7 trustee represented that, if such an agreement were approved, he did not intend to recover any interim chapter 7 or 11 administrative or priority expenses already paid,[5] and would abandon all outstanding claims that the chapter 7 estate may have.[6]

---

1. At the hearing, the trustee reported that funds on hand were reduced to $659,000.

2. This total estimated future allowances for the chapter 7 trustee's commission under sections 326 and 330, plus compensation for current bankruptcy counsel to the chapter 7 trustee.

3. The first docket entry on the current electronic docket is a scanned copy of the 107–page manual docket entries in this case, which number 1–1464. A reference to any manual docket entry will be denoted as "old" docket entry # . Electronic docket entries will be cited as "new" docket entry # .

4. The trustee described the effect of this agreement as rendering the estate administratively solvent.

5. Thus, the trustee's agreement would have the effect of rendering final Jennings's earlier interim fee allowance under section 331. It would also have the effect of insulating prior chapter 11 awards made to the Pincus firm from any attempted recovery by the trustee.

6. As will be mentioned below, the trustee holds judgments against numerous individuals and entities that have proven to be uncollectible. The trustee intends to abandon these judgments in order to close this case.

The trustee represented that his agreement with Jennings would allow this chapter 7 case to be concluded without much further expense to the estate.[7] Moreover, the chapter 7 trustee believes that such an agreement is fair and reasonable because his objections to Jennings's fee application, if sustained, would not have exceeded the reduction now agreed to by special counsel.

The United States trustee supported this agreement for the same reasons that the chapter 7 trustee articulated. After her review of Jennings's final fee application, the United States trustee also concluded that the reasonable amount that would be awarded under section 330(a) would be no less than the amount special counsel has agreed to accept: no more than $367,000.

As mentioned above, the trustee's agreement with Jennings is opposed by Pincus Verlin Hahn & Reich PC. This law firm, which ceased operating in 1989 (but apparently never dissolved under Pennsylvania law), formerly represented the debtor, Mushroom Transportation (and affiliated debtors), while the debtor was a debtor in possession under chapter 11. In that capacity, the Pincus firm was awarded interim compensation under 11 U.S.C. § 331, paid prior to the conversion of the case. In addition, the Pincus firm has been awarded a small chapter 7 administrative expense, which has not yet been paid by the trustee.

### B.

Were Jennings's agreement with the trustee approved, resulting in the voluntary reduction in its fee request, the Pincus firm would be paid in full all funds owed to it by the bankruptcy estate and would be able to retain all chapter 11 awards already received by the law firm. Moreover, any additional reduction in Jennings's current application, including total disallowance, would not further benefit Pincus. Thus, the trustee argues that the Pincus firm has no standing to object to its agreement with Jennings.[8]

■ Article III courts may only hear "cases" and "controversies." Const., Art. III, § 2. The concept of standing of a party grows out of this mandate. *Davis v. Federal Election Commission*, 554 U.S. 724, 733, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008). This concept of standing also applies to Article I bankruptcy courts, as they are units of Article III district courts. *See, e.g., In re Global Industrial Technologies, Inc.*, 645 F.3d 201, 210 (3d Cir.2011); *In re Weaver*, 632 F.2d 461, 462 n. 6 (5th Cir.1980); *see also Fred Reuping Leather Co. v. Fort Greene National Bank of Brooklyn*, 102 F.2d 372 (3d Cir.1939). As the Third Circuit has instructed when addressing the issue of standing in bankruptcy cases, a party must demonstrate:

> an "injury in fact" that is "concrete," "distinct and palpable," and "actual or imminent." *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). Additionally, the party must establish that the injury "fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Id.* (internal quotations omitted).

---

**7.** The estate now pays a monthly expense to the financial institution in which the estate keeps its funds.

**8.** The Pincus firm was the subject of two complaints brought by the chapter 7 trustee, represented by the Jennings law firm. While Pincus prevailed in both lawsuits, it appears to still resent that these lawsuits were ever prosecuted, which may account for its continued opposition to compensation for special counsel.

*In re Global Industrial Technologies, Inc.,* 645 F.3d at 210; *see generally Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). ■ "[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Federal Election Commission,* 554 U.S. at 734, 128 S.Ct. 2759. Although a case or controversy may exist at the time the litigation is commenced, it must continue at every stage of a proceeding:

> That restriction requires that the party invoking federal jurisdiction have standing—the "personal interest that must exist at the commencement of the litigation." *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (internal quotation marks omitted). But it is not enough that the requisite interest exist at the outset. "To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Arizonans for Official English v. Arizona,* 520 U.S. 43, 67 [117 S.Ct. 1055, 137 L.Ed.2d 170] (1997).

*Davis v. Federal Election Commission,* 554 U.S. at 732–33, 128 S.Ct. 2759; *see, e.g., Chamber of Commerce of U.S. v. E.P.A.,* 642 F.3d 192, 199 (D.C.Cir.2011). ■ The doctrine of mootness "has been described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness).'" *Arizonans for Official English v. Arizona,* 520 U.S. 43, 68, n. 22, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (quoting *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), which quoted Monaghan, *Constitutional Adjudication: The Who and When,* 82 Yale L.J. 1363, 1384 (1973)). "In sum, the mooting of a case can occur in one of two ways. It may occur because the legal issue in dispute is no longer amenable to review and judicial relief would serve no purpose, or it may occur because a party no longer has a personal stake in the controversy and has, in essence, been divested of standing." 15 *Moore's Federal Practice—Civil* § 101.90 (2012).

■ At the time Pincus filed its objection to Jennings's fee application, it clearly had standing to object. Were Jennings's fee application allowed in full, chapter 7 administrative claimants, such as Pincus, would be paid *pro rata* and its chapter 11 administrative expense payment might be subject to recoupment. Thus, it had a pecuniary interest in the outcome of the instant fee request. That pecuniary interest, however, would no longer exist under the terms of the trustee's agreement with special counsel. Jennings has agreed to reduce its fees so that all other chapter 7 administrative claimants, such as Pincus, will be paid in full, and all chapter 11 administrative claimants would retain their awards. *Compare In re Castellucci,* 2007 WL 7540955 (9th Cir. BAP July 26, 2007) (nondebtor spouse had standing to object to chapter 11 attorney fees because she was jointly and severally liable on the fees, and would be entitled to 25% of any disgorgement). Thus, if this settlement were approved, Pincus's objection would be considered as moot.

Nonetheless, the Pincus objector contends that its status as counsel to the debtor, when the debtor was a chapter 11 fiduciary for all creditors, gives it continuing fiduciary status. If its objection were sustained, it argues that other creditors, such as those holding unpaid chapter 11 priority claims, might benefit.

■ This argument is unpersuasive for two reasons.

First, as I noted some years ago, "the Pincus law firm ..., as authorized counsel to the chapter 11 debtors in possession, stood in a fiduciary capacity toward their clients. However, once a chapter 7 trustee is appointed there is no longer a debtor in possession; the chapter 7 debtor is not a fiduciary; and counsel for the chapter 7 debtor does not represent the trustee.... See In re NRG Resources, Inc., 64 B.R. 643, 646–47 (W.D.La.1986). Thus, [a chapter 7] debtor's counsel is not in a fiduciary relationship to the chapter 7 trustee upon conversion of the case." In re Mushroom Transp. Co., Inc., 366 B.R. 414, 451 (Bankr.E.D.Pa.2007), aff'd, 388 Fed.Appx. 204 (3d Cir.2010); see also In re Ray, 314 B.R. 643, 659 (Bankr.M.D.Tenn.2004) ("[A] chapter 11 debtor in possession is treated as a bankruptcy trustee ...; the chapter 7 debtor is not.") (citation omitted).

■ Accordingly, once this case was converted to chapter 7, neither the debtor nor its counsel held any continuing fiduciary status to creditors. That status is now held by the chapter 7 trustee, represented by the trustee's counsel. See, e.g., In re Brierwood Manor, Inc., 239 B.R. 709, 716 (Bankr.D.N.J.1999). And the chapter 7 trustee believes that it is in best interest of the estate to resolve his objections to the Jennings fee application in a manner he considers both fair and reasonable and that will permit this long-pending bankruptcy case to finally close in the near future.

Second, when the Pincus firm ceased operations in 1989, it was replaced as debtor's counsel by another law firm: Astor, Weiss and Newman.[9] Therefore, as of 1989, Pincus ceased representing the chapter 11 debtor, and any continuing fiduciary duty then ended. Thus, its contention that it has a present fiduciary duty to maximize the chapter 7 bankruptcy estate for the benefit of creditors is unpersuasive.

Alternatively, Pincus also argues that any party in this bankruptcy case can raise the issue of a conflict of interest, even if that party has no pecuniary gain in doing so. See generally In re Congoleum Corp., 426 F.3d 675, 685 (3d Cir.2005) (insurers, although not creditors, had standing to object to retention of special counsel, as the issue may "implicate the integrity of the bankruptcy court proceeding as a whole."). This contention is made debatable by the fact that Pincus previously raised a similar conflict issue in November 1993, which objection was denied by order dated May 17, 1994. Furthermore, as will be discussed below, it is unlikely that the nature of the alleged conflict raised by Pincus implicated the integrity of this bankruptcy case.

■ Even if I were to conclude that Pincus's objection would become moot if the trustee's agreement with Jennings were approved, I would still have the responsibility to insure that the fees awarded to Jennings were fair and reasonable. In In re Busy Beaver Bldg. Centers, Inc., 19 F.3d 833, 841 (3d Cir.1994), the Third Circuit Court of Appeals stated: "Beyond possessing the power, we think the bankruptcy court has a duty to review fee applications, notwithstanding the absence of objections by the United States trustee ('UST'), creditors, or any other interested party, a duty which the Code does not expressly lay out but which we believe derives from the court's inherent obli-

---

9. On January 16, 1990, Mushroom sought the appointment of substitute counsel, Astor, Weiss & Newman. See old docket entry #1310. The application was approved retroactive to December 18, 1989. See old docket entry #1311.

gation to monitor the debtor's estate and to serve the public interest."

Thus, rather than conclude that the trustee's agreement with Jennings should be approved simply because Pincus's objection was moot, I shall consider Jennings's fee application and Pincus's objections thereto, and independently determine whether the voluntary reduction proposed by Jennings yields a result that is fair and reasonable under section 330(a). *See In re Wireless Telecommunications Inc.*, 449 B.R. 228, 238 (Bankr.M.D.Pa.2011) (after an independent review, bankruptcy court concludes that voluntary reduction proposed by counsel was fair and reasonable). In other words, is the amount of compensation now acceptable to the trustee and Jennings greater than the amount permitted by section 330(a)?

■■■■■ In so reviewing Jennings's extensive fee application, however, I need not render detailed findings. *See In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d at 844–45 (in independently reviewing a fee application, a bankruptcy court "need only correct reasonably discernible abuses, not pin down to the nearest dollar the precise fee to which the professional is ideally entitled."); *In re Wireless Telecommunications Inc.*, 449 B.R. at 238. Moreover, a determination of reasonableness under section 330(a) is within this court's discretion. *See, e.g., Zolfo, Cooper & Co. v. Sunbeam–Oster Co., Inc.*, 50 F.3d 253, 257 (3d Cir.1995); *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d at 841 (section 330(a) "imbues the court with discretionary authority"); *In re Iannini*, 460 B.R. 676, 679 (Bankr.W.D.Pa.2011), *vacated for lack of jurisdiction*, 487 B.R. 434, 2012 WL 5992499 (W.D.Pa.2012).

II.

Jennings's lengthy fee application contains the following lodestar information based upon attached exhibits (with Jennings's footnotes omitted).

| Exhibit No. | Time Period | Hours | Fees | Expenses | Total | Case Phase |
|---|---|---|---|---|---|---|
| 2 | 8/10/92–5/31/93 | 157.80 | $17,181.00 | | $17,338.80 | Initial Applications, Investigation and Complaint |
| 3 | 6/1/93–12/29/95 | 1,777.70 | 243,403.58 | $52,734.94 | 297,916.22 | Initial Investigation, Lawsuit and Discovery |
| 4 | 1/26/96–12–31–99 | 1,489.10 | 248,474.40 | 28,887.07 | 278,850.57 | Initial Dispositive Motions, USDC Appeals and Payee/Ganz Recovery Judgments |
| 5 | 1/1/00–11/30/04 | 296.40 | 61,013.50 | 8,911.67 | 70,221.57 | USDC & 3d Circuit Appeals |
| 6 | 1/1/05–12/31/07 | 764.30 | 155,742.00 | 9,318.45 | 165,824.75 | Trial on Remand |
| 7 | 1/1/08–12/31/10 | 197.80 | 41,898.50 | 4,664.74 | 46,741.04 | Second 3d Cir. Appeal and Payee Cases |
| 8 | 1/1/11–5/31/12 | 38.90 | 4,469.50 | 6.86 | 4,515.26 | File Search & Archives Production to Trustee and Fee Application |
| TABLE | TOTAL | 4,722.00 | 772,182.48 | 104,503.73 | 876,686.21 | |
| ADJ'D | TOTAL | 4,511.70 | $723,820.00 | $93,024.84 | $816,844.84 | |

| Name | Timekeeper Code (Initials) | Avg. Billing Rate | Hours | Total |
|---|---|---|---|---|
| CPREK, Kent | KGC | $195.38 | 2,156.2 | $421,286.00 |
| FOSSI, Linda | LSF | $134.63 | 784.2 | $105,578.00 |

| | | | | |
|---|---|---|---|---|
| COLEMAN, Magdeline D. | MDC | $153.98 | 646.3 | $99,515.00 |
| HAURIN, Robert | RH | $100.19 | 197.0 | $19,737.50 |
| SZNYTER, Judith | JAS | $229.23 | 39.1 | $8,963.00 |
| ROSENTHAL, Sanford | SGR | $177.84 | 30.1 | $5,353.00 |
| LIEBMAN, Jennifer | JBL | $160.00 | 13.9 | $2,224.00 |
| COLEMAN, Elizabeth | EAC | $230.00 | 10.6 | $2,438.00 |
| MURRAY, Susan | SAM | $134.66 | 10.3 | $1,387.00 |
| CHO, John | JHC | $160.00 | 8.0 | $1,280.00 |
| McKENNA, Tracy | SMC | $230.00 | 5.0 | $1,150.00 |
| CRAMER, Shanna | TCM | $125.00 | 4.4 | $550.00 |
| WILLIAMS [Taggart], Lisa | LAW | $215.00 | 3.9 | $838.50 |
| MEYER, Eric | DMC | $230.00 | 2.6 | $598.00 |
| COSTA, Dawn | EBM | $220.00 | 2.5 | $550.00 |
| FLANAGAN, Jerome | JAF | $230.00 | 2.4 | $552.00 |
| FELDMAN, Ilana | IBF | $130.00 | 2.3 | $299.00 |
| KELMAN, Lane | LFK | $165.00 | 1.6 | $264.00 |
| KOHN, Thomas | THK | $180.00 | 0.1 | $18.00 |
| **TOTALS** | | | 3,920.5 | $672,581.00 |

| Name | Timekeeper Code (Initials) | Position | Avg. Billing Rate | Hours | Total |
|---|---|---|---|---|---|
| GERIA, Stephen | SMG | LC | $90.00 | 106.5 | $9,585.00 |
| CARNEY, Thomas | TJC | P | $65.00 | 79.9 | $5,193.50 |
| MORTON, Catherine | CTM | LC | $84.48 | 79.5 | $7,465.50 |
| CONEY, Lori | LC | P | $95.00 | 60.5 | $5,747.50 |
| KANOFSKY, Allison | KA | P | $55.00 | 59.7 | $3,283.50 |
| GIORDANO, Kristine | KG | P | $66.53 | 32.1 | $2,135.50 |
| KAPLAN, David | DMK | LC | $55.00 | 29.9 | $1,644.50 |
| OSTROFSKY, Suzanne | SJO | P | $95.00 | 22.7 | $2,156.50 |
| TILSNER, Michelle | MMT | P | $55.00 | 17.8 | $979.00 |
| SKALA, Lauren | LS | LC | $95.00 | 14.6 | $1,387.00 |
| TAGGART, Scott | STT | P | $65.00 | 11 | $715.00 |
| LOPEZ, Susan | STL | P | $55.00 | 10.7 | $588.50 |
| POWELL, Nancy | NLP | P | $50.00 | 7.9 | $395.00 |
| GAILLARD, James A. | JAG | P | $65.00 | 4.3 | $279.50 |
| SIEGER, Jennifer | JLS | P | $85.00 | 1.9 | $161.50 |
| PHILLIPS, Beverly | BBP | P | $95.00 | 1.2 | $114.00 |
| FICE, Carrie | CLF | P | $95.00 | 0.3 | $28.50 |

The services rendered by Jennings were categorized by the law firm as follows:

1. General Case Support and Tax Issues—Fees: $16,879.50; Total Hours: 109.30

2. Asset Investigation and Reconstruction—Fees: $14,672.50; Total Hours: 109.50

3. Fee/Employment Applications—Fees: $3,094.50; Total Hours: 28.50

4. Litigation involving the following defendants:

a. Jonathan Ganz—Fees: $3,180.50; Total Hours: 26.9

b. Astor, Weiss and Newman/Rawle & Henderson—Fees: $17,415.50; Total Hours: 112.30

c. (MidLantic Bank/PNC Bank)—Fees: $27,532.00; Total Hours: 161.10

d. Northwest Acceptance/OrBanco/Security Pacific Bank/Bank of America Fees: $72,083.00 Total Hours: 424.70

e. Ganz Affiliates/Payees—Fees: $80,959.75; Total Hours: 568.93

f. Pincus, Verlin, Hahn & Reich/Continental Bank—Fees: $568,356.07; Total Hours: 2,970.40

As it is the time spent on the Pincus litigation that is the the bulk of the services rendered and the focus of Pincus's objection, I note the following breakdown of the services rendered by Jennings in that litigation:

| Final Application Ex. No | Time Period | Hours | Fees | Case Phase |
|---|---|---|---|---|
| 2 | 8/10/92–5/31/93 | 127.20 | $13,682.50 | Initial Applications— Investigation and Complaint |
| 3 | 6/1/93–12/29/95 | 1,354.90 | $206,341.65 | Initial Investigation, Lawsuit and Discovery |
| 4 | 1/2/96–12/31/99 | 592.10 | $164,073.90 | Initial Dispositive Motions & USDC Appeals |
| 5 | 1/1/00–11/30/04 | 176.50 | $39,452.50 | USDC & 3d Circuit Appeals |
| Subtotal | Joint PVHR/CB | 2,250.70 | $423,550.55 | |
| 6 | 1/1/05–12/31/07 | 731.90 | $151,132.00 | Trial on Remand |
| 7 | 1/1/08–12/31/10 | 190.00 | $40,234.00 | Second 3d Cir. Appeal |
| 8 | 1/1/11–5/31/12 | 8.20 | $1,802.00 | Close–Out |
| Subtotal | PVHR Only | 930.10 | $193,168.00 | |
| TABLE | TOTAL | 3,180.70 | $616,718.55 | |
| | Less hours without detail | 210.30 | $48,362.48 | |
| ADJ'D | TOTAL | 2,970.40 | $568,356.07 | |

The final Jennings application also provided this summary of its expenses:

| | 1992–1995 | 1996–1999 | 2000–2004 | 2005–2007 | 2008–8/2011 | TOTAL 1992–2011 |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| Copies | $23,233.07 | $9,100.16 | $6,638.67 | $701.02 | $2,846.90 | $42,519.82 |
| Delivery | $655.90 | $139.16 | | $23.86 | $247.80 | $1,066.72 |
| Depositions | $1,274.40 | $50.00 | | | | $1,324.40 |
| Fax | $838.33 | | $368.41 | $40.75 | $4.00 | $1,251.49 |
| Filing Fees | $384.00 | $493.00 | $255.00 | | $455.00 | $1,587.00 |
| Meeting Expenses | $87.28 | | | | | $87.28 |
| Postage | $1,672.68 | $1,026.49 | $66.73 | $19.05 | $53.86 | $2,838.81 |
| Reports | $973.75 | | | | | $973.75 |
| Computer Research | $14,964.02 | $7,608.49 | $946.98 | $2,697.35 | $1,057.18 | $27,274.02 |
| Service of Process | $1,835.31 | $636.73 | | $622.00 | | $3,094.04 |
| Telephone | $995.78 | $67.96 | $1.10 | $12.33 | | $1,077.17 |
| Transcripts | $1,763.31 | $1,259.00 | $552.00 | $4,497.90 | | $8,072.21 |
| Travel | $510.46 | $200.39 | $82.78 | $17.00 | | $810.63 |
| Witness Fees | $712.50 | $260.00 | | $75.00 | | $1,047.50 |
| **TOTAL** | $49,900.79 | $20,841.38 | $8,911.67 | $8,706.26 | $4,664.74 | $93,024.84 |

## III.

The Jennings firm was appointed as special counsel on August 10, 1992. *See* old docket # 1388. As such, the law firm represented the trustee in four adversary proceedings against numerous defendants. All of the litigation stemmed from a theft of Mushroom (and affiliate) funds by Jonathan Ganz in 1987 and 1988. Ganz at that time was a shareholder in the Pincus law firm, which represented the chapter 11 debtor. The United States trustee for Region 3 investigated Ganz's activities and prepared a report that was used to criminally prosecute him. The report reflected that Ganz stole at least $2,337,892.48 from 19 different bankruptcy estates, including the Mushroom and its affiliate estates. The United States trustee determined that at least $569,940.07 in Mushroom and affiliate funds were embezzled by Ganz.

In addition to suing Ganz, the Jennings firm, on behalf of the trustee, sued numerous individuals and entities whom the trustee believed received some of the stolen Mushroom funds, or whom the trustee believed acted improperly and thus allowed Ganz to steal Mushroom assets. Two complaints, virtually identical, were filed against the Pincus firm and Continental Bank as well. One of these complaints also named various shareholders of Pincus as defendants and included a claim under ERISA. As summarized by the District Court, this 1994 adversary proceeding alleged:

Count I (by the trustee against PVHR [Pincus] and Ganz seeking a "turnover" of estate property); Count II (by the trustee against PVHR alleging a breach of fiduciary duty based on their position as escrow agent); Counts III and V (by the trustee against Continental Bank asserting a breach of fiduciary duties for releasing estate property to Ganz and for wrongful conversion of the estate property); Count VI (by the trustee against PVHR and Continental Bank alleging breach of contract for violating the June 1987 stipulation or any other implied contract); Count VII (by the trustee against the shareholders of PVHR alleging failure to exercise rea-

**160**

sonable care to ensure that the lawyers within their firms safeguarded client assets); and Count VIII (by the trustee and the pension funds and administrators against PVHR and Continental Bank claiming that these defendants violated fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA") as custodians of plan assets).

*In re Mushroom Transp. Co., Inc.,* 282 B.R. 805, 813 (E.D.Pa.2002).

Ultimately, the trustee did not prevail in either of these two lawsuits, although some of the trustee's claims against Pincus, but not Continental Bank, did survive summary judgment and so went to trial. *See In re Mushroom Transp. Co., Inc.,* 382 F.3d 325 (3d Cir.2004). The trustee's claim under ERISA was dismissed on summary judgment. *Id.*

Pincus, in its objection to Jennings's fee application, contends that the Jennings firm, which had represented various pension fund creditors in asserting claims against Mushroom and its affiliates, should not have asserted any ERISA claim against Pincus on behalf of the trustee, because such a claim, if successful, would have inured solely to the pension fund creditors and not to the chapter 7 estate. Although another law firm, Schnader, Harrison, Segal & Lewis, had entered an appearance on behalf of the pension funds in this adversary proceeding, Pincus maintains that, in reality, Jennings continued to represent those creditors in prosecuting the ERISA claim, preparing and filing all pleadings in connection with the claim and arguing against summary judgment on behalf of the claim. Pincus contends that Jennings's ERISA representation was in conflict with the chapter 7 trustee's interest to recover property for the benefit of all creditors, not simply the pension funds.

Jennings's response is that the ERISA claimants were separate parties and were separately represented in the 1994 adversary proceeding. As special counsel, Jennings maintains that it was engaged by the trustee to recover as much money as possible from Pincus, raising all possible claims, and once that was accomplished it would have no role in determining the distribution of that recovery. Any dispute involving the disposition of funds recovered would be between the trustee and counsel for the ERISA claimants, not Jennings. Thus, Jennings disputes that it represented parties with conflicting interests in that Pincus litigation.

At the time that Jennings was appointed special counsel, the alleged conflict of interest was not present. According to Pincus, it arose only when Jennings raised the ERISA claim.

In support of its objection, Pincus refers to 11 U.S.C. § 328(c), which states:

the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

As explained in *In re Sauer,* 222 B.R. 604, 609 (8th Cir. BAP 1998):

Although § 328(c) confers considerable discretion on the court, it does not compel the disallowance or disgorgement of fees. Indeed, a number of courts have noted the statute's permissive construction as the basis for a refusal to deny fees.

*See, e.g., In re Prince,* 40 F.3d 356, 359 (11th Cir.1994) ("[T]he language of 11 U.S.C. § 328(c) permits a court to deny compensation to professionals found not to be disinterested persons, but does not require a denial of fees in those instances.").

■ Section 327(e) of the Bankruptcy Code, which governs the appointment of special counsel in bankruptcy cases, does not require that special counsel be "disinterested," as is required by general bankruptcy counsel engaged under section 327(a). *See, e.g., In re J.S. II, L.L.C.,* 371 B.R. 311, 317 (Bankr.N.D.Ill.2007) ("The key difference between employment under section 327(a) and employment under section 327(e) is that the conflict of interest standard in section 327(e) is more relaxed than the standard embodied in section 327(a).... There is no requirement under section 327(e) that special counsel be disinterested.") (footnote and citation omitted); *In re South Shore Golf Club Holding Co., Inc.,* 182 B.R. 94, 95 (Bankr.W.D.N.Y.1995) ("[S]pecial counsel need not be disinterested as that term is defined by section 101(14), but must merely not represent or hold an interest adverse to the special matter."). Therefore, the issue raised by Pincus under section 328(c), as applied to special counsel, is whether Jennings represented an interest adverse to the chapter 7 estate to the extent it prosecuted the ERISA claim. If so, the second issue involves the appropriate exercise of this court's discretion under section 328(c).

■ After considering Pincus's arguments at the hearing, I conclude that I need not decide whether Jennings held a conflict of interest, to the extent it prosecuted an ERISA claim against Pincus and Continental Bank, in order to determine whether the trustee's proposed resolution of Jennings's fee application results in a reasonable award under section 330(a). This claim constituted only one of eight claims in only one of four adversary proceedings. If I assume *arguendo* that such a conflict existed, and if I further hypothesize that a recovery occurred under that ERISA claim, to the extent that the estate did not benefit from such recovery Jennings's request for compensation for services and expenses connected with the ERISA portion of the litigation would not have been allowed. Recovery on the ERISA claim, however, may not have precluded the trustee from recovery under the other seven claims raised in the 1994 litigation.[10] Thus, to the extent that Jennings prosecuted the ERISA claim, such prosecution did not harm the chapter 7 estate, except possibly to the extent that the estate was asked to pay for professional services that only benefitted a particular

---

**10.** Success upon Count VIII, the ERISA claim, would not preclude the trustee from succeeding on its other claims, such as turnover, negligence or breach of fiduciary duty. Pincus therefore assumes that if the trustee had succeeded upon ERISA and any other claim, any recovery would be impressed with a trust in favor of the pension funds. Yet, given the disposition by Ganz of the funds taken from the Mushroom estate, imposition of a trust may not have been possible:

[A] plaintiff could seek restitution in equity ... where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's

possession.... But where the property sought to be recovered or its proceeds have been dissipated so that no product remains, the plaintiff's claim is only that of a general creditor, and the plaintiff cannot enforce a constructive trust of or an equitable lien upon other property of the defendant. Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.

*Great–West Life & Annuity Insurance Co. v. Knudson,* 534 U.S. 204, 213–14, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) (citations omitted).

class of creditors.[11] The appropriate ruling in that hypothetical instance, and now as well, would be at most to disallow the fees requested in part. *See In re Raymond Professional Group, Inc.,* 421 B.R. 891, 905 (Bankr.N.D.Ill.2009); *In re Fibermark, Inc.,* 349 B.R. 385, 409 (Bankr.D.Vt. 2006); *In re Amdura Corp.,* 139 B.R. 963 (Bankr.D.Colo.1992); *see generally In re Sauer,* 222 B.R. at 609–10 (reversing the bankruptcy court's disallowance of all counsel fees as an abuse of discretion); *In re Kendavis Industries Intern., Inc.,* 91 B.R. 742, 761–62 (Bankr.N.D.Tex.1988) (granting only a partial disallowance of counsel fees owing to a conflict of interest).

A reduction of Jennings's fees, so as to disallow time spent litigating the ERISA claim owing to a conflict of interest, would be far less than the reduction Jennings has already agreed to with the trustee. Therefore, even if I accept *arguendo* that Jennings held a conflict of interest when prosecuting an ERISA claim in the 1994 adversary proceeding, such a conflict does not warrant disallowing the instant fee application to an amount less than the $367,000 now requested by the trustee and agreed to by Jennings.

### IV.

Pincus also objects to Jennings's fee application on the basis that the "vast majority" of the services provided did not benefit the bankruptcy estate. The trustee's status report, exhibit 1, reveals that Jennings's representation as special counsel on behalf of the chapter 7 trustee resulted in only a modest recovery for the estate, far less than the amount sought by Jennings in its fee application. Indeed, to date, all of the litigation brought by special counsel on behalf of the trustee has resulted in the recovery of $76,311.00 from one law firm defendant in Adv. No. 94–0003, $4,000 from one defendant in Adv. No. 94–1004, and $50,000 from the Pennsylvania Lawyers Fund for Client Security.[12] A number of judgments in favor of the trustee, primarily by default, have gone uncollected and the trustee acknowledges that he has no expectation of future recovery. In other instances, judgments were rendered in favor of the defendants, such as Pincus, Continental Bank, and Security Pacific Bank.

As noted earlier, Jennings seeks a final allowance under 11 U.S.C. § 330(a), which provides for an award to professionals, such as counsel to the trustee, for "reasonable compensation for actual, necessary services rendered," and which also states:

(3) In determining the amount of reasonable compensation to be awarded ... the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

---

11. Moreover, in that hypothetical situation Jennings might argue to the extent the ERISA claimants received a recovery, and to the extent such recovery reduced their claims against the bankruptcy estate, there was a benefit to the estate.

12. The trustee also reports recovering $921.67 from Sorensen Industries, but that does not appear to be the result of services provided by special counsel.

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

■ In this circuit, an allowance of reasonable fees under section 330(a) for a professional, such as an attorney, is determined using the lodestar approach. *See, e.g., In re Busy Beaver Building Centers, Inc.*, 19 F.3d at 849, 856. The lodestar method involves the multiplication of a prevailing market hourly rate, taking into account the experience of the professional and the nature of the professional services provided, by the number of hours reasonably expended in providing those services. *See, e.g., In re Busy Beaver Building Centers, Inc.*, 19 F.3d at 849 n. 21 ("Under the lodestar analysis, a court first establishes a reasonable hourly rate (corresponding to the value of the services and the cost of comparable services in § 330(a)(1)) for each set of compensable services (corresponding to the nature of the services in § 330(a)(1)), and then multiplies each rate by the reasonable number of hours of compensable work included in each respective set (corresponding to the time and extent of the services in § 330(a)(1))"); *see also Pennsylvania Environmental Defense Foundation v. Canon–McMillan School District*, 152 F.3d 228, 231–32 (3d Cir. 1998),

■ In applying section 330(a), a bankruptcy court must consider the benefit achieved by the services rendered. *See, e.g., In re Engel*, 124 F.3d 567, 573 (3d Cir.1997). Indeed, the Third Circuit Court of Appeals noted that there is an "express mandate of 'benefit-to-the-estate' imposed by § 330." *Id.* at 577. The language of section 330(a)(3), however, only requires that the services be reasonably likely to yield a benefit to the estate at the time they were provided; not that they actually do so. *See, e.g., In re Value City Holdings, Inc.*, 436 B.R. 300, 305 (Bankr. S.D.N.Y.2010); *see generally Stalnaker v. DLC, Ltd.*, 376 F.3d 819, 825 (8th Cir.2004) ("Compensation may be reasonable though the trustee's services do not benefit the estate."). For example, as the Fifth Circuit Court of Appeals has observed:

This duty placed Aimen under an obligation to his client, the debtor's estate, to abandon the preference suit once it became reasonably obvious that further litigation would cost more than it was likely to bring into the estate. We emphasize the words "reasonably obvious." The standard is an objective one: did a time come when a reasonable lawyer in Aimen's position would have abandoned the suit? And it allows room for differences in judgment. When abandonment is not the obviously right course, when reasonable professionals could differ over the right course, the professional is not to be penalized, just as a trustee is not to be surcharged for a discretionary judgment that later proves to have been mistaken.

*Matter of Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir.1995) (citation omitted); *see In re Ames Department Stores, Inc.*, 76 F.3d 66, 71–72 (2d Cir.1996), *abrogated in part on other grounds by Lamie v. U.S. Trustee*, 540 U.S. 526, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004):

In enacting section 330, Congress departed somewhat from this doctrine of strict review, taking the position that "compensation in bankruptcy matters be commensurate with the fees awarded for comparable services in non-bankruptcy cases." *In the Matter of UNR Indus.*,

*Inc.*, 986 F.2d 207, 208–09 (7th Cir.1993). With the 1994 amendments of section 330, Congress made another move towards greater equity in estate management. It provided that an award for fees might be made for services that were "beneficial at the time at which the service was rendered," § 330(a)(3)(C), and, by inverse construction, "reasonably likely to benefit the debtor's estate." *Id.* § 330(a)(4)(A)(ii)(I).…

As reasoned in *Collier,* if the services of a debtor's attorney "are reasonably likely to benefit the debtor's estate, they should be compensable." 2 *Collier* ¶ 330.04 at 330–43. Upon remand, this is the test the bankruptcy court should apply in an objective manner, based upon what services a reasonable lawyer or legal firm would have performed in the same circumstances. *See In the Matter of Taxman Clothing Co.,* 49 F.3d 310, 315 (7th Cir.1995).

*See, e.g., In re Mednet,* 251 B.R. 103, 108 (9th Cir. BAP 2000); *In re Auto Parts Club, Inc.,* 211 B.R. 29, 35 (9th Cir. BAP 1997) (Standard under section 330(a) "is an objective one as to whether the fees were reasonable and necessary at the time they were incurred…. The policy behind § 330 is not one based on hindsight, but rather one based on an objective determination at the time services were rendered."). Thus, "[s]ervices reasonably likely to provide an identifiable, tangible and material benefit to the estate when rendered are compensable even if they don't actually end up providing such a benefit (as long as the services are otherwise compensable under § 330(a))." *In re Tan, Lie Hung & Mountain States Investments, LLC,* 413 B.R. 851, 855 (Bankr. D.Or.2009).

■■■ Upon my independent review of the Jennings fee application, the hourly rates sought by special counsel were rea-sonable, given the nature of the services provided and the professionals who provided them. (Pincus does not contend otherwise.) In so concluding, a bankruptcy judge may use his own knowledge of the market and of the professional's experience to determine the appropriate hourly rate. *See, e.g., In re Recycling Industries, Inc.,* 243 B.R. 396, 404 n. 6 (Bankr.D.Colo. 2000); *see also In re Busy Beaver Building Centers, Inc.,* 19 F.3d at 854 ("Although this case does not present us with a pressing need to define precisely how a bankruptcy court should verify the market rates, if any, for select clerical services, we observe that certainly a bankruptcy judge's experience with fee petitions and his or her expert judgment pertaining to appropriate billing practices, founded on an understanding of the legal profession, will be the starting point for any analysis.").

Therefore Pincus's objection under section 330(a) concerns whether the time spent by Jennings was reasonable and necessary.

In its fee application, Jennings identifies approximately $17,000 for time spent assisting the trustee and his accountant in addressing certain tax issues and communicating with the trustee regarding potential claims; $15,000 in recovering documents and reviewing records involving Ganz's theft of Mushroom assets, including the report of the United States trustee; and $3,000 in preparing and filing the present detailed fee application. *See* 11 U.S.C. § 330(a)(6). In addition, Jennings discloses approximately $3,000 in services in obtaining a default judgment against Ganz, reviving that judgment and (unsuccessfully) attempting to recover on that judgment, and making claims to Pennsylvania's and New Jersey Lawyer Client Security Funds; and slightly more than $17,000 in time spent to bring suit and

successfully negotiate a $76,000 settlement with Astor, Weiss and Newman. All of those services were reasonable and necessary, and were beneficial to the estate.

The Jennings fee application also identifies a total of about $27,500 in time spent in litigation involving MidLantic Bank (ultimately PNC Bank) and other defendants, $72,000 in time prosecuting claims against Northwest Acceptance (OrBanco, later Security Pacific Bank and ultimately Bank of America) and other defendants, and $81,000 in time litigating on behalf of the trustee claims against various entities and individuals referred to in the application as "Ganz affiliates." The trustee was unable to prevail against the first two named entities because he was unable to trace their receipt of Mushroom funds taken by Ganz. In one instance, he did not prevail on defendant's motion for summary judgment (but did avoid summary judgment on the issue of limitations). In the second instance, the trustee did not prevail at trial. As to the Ganz affiliates, the trustee prevailed by default as to some,[13] but was unable to execute on his judgments; as for others, again he had no success owing to an inability to trace the Mushroom assets to those defendants. In almost every instance, Jennings filed appeals from adverse rulings, including appeals to the Third Circuit Court of Appeals.

■■■ In reviewing the Jennings fee application and its lodestar disclosures, I conclude that it was reasonable to initially bring suit against the Ganz "affiliates" and the two other entities, and to conduct discovery and to oppose summary judgment on the affirmative limitations defense. Ganz had stolen more than $500,000 and it

was appropriate for the trustee to make all reasonable claims to recover those funds. Investigation and discovery during litigation were appropriate. However, because Ganz received legitimate compensation as an attorney, as well as stole funds from numerous other bankruptcy estates, not simply Mushroom funds, and then commingled all legal and illegal funds primarily in one bank account in his name, the issue of the difficulty of tracing should ultimately have been apparent to counsel. Moreover, by the time special counsel commenced these lawsuits—four to six years after Ganz stole Mushroom funds—the trustee's ability to obtain relevant documents to assist in tracing was more difficult.

Nonetheless, Jennings prosecuted all contested litigation, not only in this forum, but in the district court and court of appeals. At some point during the litigation, counsel objectively should have realized that the trustee's chances for obtaining and/or recovering on those judgments were highly unlikely, and thus it was not appropriate to incur further expenses chargeable to the estate. That fact, as well as the very modest results ultimately obtained, warrant a substantial reduction in the allowance for legal services rendered under section 330(a). Upon consideration of Jennings's lodestar data, I conclude that only $10,100 for the Midlantic litigation, $37,800 for the Security Pacific litigation and $41,500 for the Ganz affiliate litigation constituted reasonable and necessary services. *See In re Keene Corp.*, 205 B.R. 690, 702 (Bankr.S.D.N.Y.1997) (counsel awarded for approximately 20% of lodestar request for investigating and ini-

---

13. Default judgments were entered against 28 Corporation, Mercantile Acceptance Corporation, American Industrial Equipment, Kay Denoncour, American Aerials and Equipment Corporation, Inc., Rich Denoncour, Rental Systems International, Inc., Trend Agra Corp., Brad Cohen, and Kemcar Systems, Inc. for $250,000 as to some and $350,000 as to others.

tially prosecuting "highly speculative" litigation); *see generally Unsecured Creditors' Committee v. Puget Sound Plywood, Inc.,* 924 F.2d 955, 959, 961 (9th Cir.1991) (counsel seeking compensation from the estate under section 330(a) must exercise reasonable billing judgment, based upon reasonably expected recovery); *In re Donaldson,* 1996 WL 161677, at *2 (N.D.Cal. Apr. 2, 1996) (requested counsel fees were disallowed when special counsel sought compensation for services rendered in connection with an appeal that had very little likelihood of success).

Therefore, without considering the time spent in connection with the Pincus litigation, or any reimbursement of expenses incurred by special counsel, Jennings would be allowed about $144,400 in fees for services rendered as special counsel under section 330(a).

As for the extensive Pincus litigation, which involved two similar adversary proceedings, resolution of numerous pretrial motions, a multi-day trial, and two appeals to the district court and court of appeals, the Jennings fee application reveals a lodestar amount of $568,356.07. In objecting to compensation, Pincus asserts that there was duplication of services, obvious defenses for the trustee to overcome, an allegedly known inability of the trustee to collect from Pincus (which had stopped operating and had no liability insurance) even if the trustee had prevailed, and litigation of the ERISA claim mentioned earlier.

■ Upon review of Jennings's application, I find that the issues posed by Pincus's objection under section 330(a) are persuasive in part. The two separate but very similar lawsuits, resulting in amended complaints and motions to amend, seem to have arisen from counsel's changing legal theories rather than necessity; numerous procedural motions and disputes arose from this evolution; and the laches and limitations defenses raised by Pincus were obvious obstacles, as was Continental Bank's defense under Pennsylvania's Uniform Fiduciaries Act. The ERISA claim did not have support from reported decisions. Nonetheless, the Third Circuit determined that the trustee was entitled to a trial on its claims against Pincus. Ganz had been an attorney with that law firm and had stolen funds while the firm was representing the debtor; thus investigation via discovery of claims against the law firm was appropriate. Furthermore, a judgment against the Pincus law firm may have been recoverable against certain of its shareholders, even if the professional corporation had insufficient assets. *See* 15 Pa.C.S.A. § 2925(b), (d).

Allowing for these factors, and recognizing that on appeal Jennings persuaded the Third Circuit that Pincus was not entitled to summary judgment in opposing the trustee's claims and thus remanded those claims for trial, and for which lengthy trial in this court Jennings asserts that its services exceeded $150,000 in value, I conclude after review of Jennings's lodestar submissions that only $175,000 (of more than $568,000 in its lodestar request) would be allowable as reasonable and necessary at the time the services were rendered. In so concluding, I view about $75,000 in trial services as compensable, given some of the unnecessary evidentiary disputes and because meeting the trustee's burden on the limitations issue was objectively problematic. *See also In re Eckert,* 414 B.R. 404 (Bankr.N.D.Ill.2009) (special counsel awarded approximately 38% of requested fees in light of limited recovery and failure to exercise billing judgment in prosecuting litigation on behalf of the trustee). Added to the $144,400 previously discussed, yields an allowance under section 330(a) for services rendered of $319,400. This amount is only $47,600 less

than the total allowance the trustee had negotiated with Jennings.[14]

As noted earlier, Jennings also sought reimbursement of more than $93,000 in expenses. Upon review, it is apparent that almost $50,000 of these expenses were incurred before 1996, when Jennings was investigating claims, researching legal theories, conducting discovery and filing and serving complaints. These expenses predate any expenses associated with appeals and the lengthy Pincus trial.

█ Applying section 330(a), I conclude that Jennings would be entitled to reimbursement for at least $47,600 of the more than $93,000 in expenses incurred by the firm as special counsel. Thus, my independent review is consistent with the position of the United States trustee: that the chapter 7 trustee's proposed resolution of his objections to the Jennings final fee application is reasonable, in that prosecution of objections to the fee application would yield an allowance equal to or greater than the settlement amount agreed to by Jennings. *See generally See In re Wireless Telecommunications Inc.,* 449 B.R. at 238; *cf. In re Nutraquest, Inc.,* 434 F.3d 639, 644–45 (3d Cir.2006) (discussing the standard for approving a settlement under Rule 9019(a)).

Accordingly, I will enter an order approving the trustee's agreement with Jennings, resulting in a voluntary reduction in the fee application and yielding an allowance of no more than $367,000, so that this chapter 7 case is administratively solvent and the trustee can move to complete his administration.

14. I reach a similar result by analyzing Jennings's lodestar data in a different manner.

The law firm provided services to the trustee between August 1992 and December 31, 1995 that it valued at approximately $260,000. Such services included investigation and research of claims, preparing and serving complaints, conducting discovery against multiple defendants, and filing and opposing various motions. These services predate any time spent by counsel on trials, including the multi-day trial against Pincus, and also predate counsel's prosecution of any appeals. Only the Midlantic litigation was partially resolved via summary judgment during this period; the appeal from that decision was taken post–1995. After December 31, 1995 and prior to the Pincus trial, Jennings provided services it values at approximately $203,000, largely responding to dispositive motions and prosecuting numerous appeals.

As noted above, I conclude that time spent by counsel pre–1996 in investigating claims against Ganz and others, including Pincus, conducting discovery and researching issues, was reasonable and necessary. Some, but not all, of the pre–1996 time spent initiating and responding to pretrial motions, including summary judgment, is also compensable. In addition, as the trustee had some success in prosecuting two appeals taken, some (but certainly not all) of the post–1995 services involving appeals would also be compensable.

Upon my review of the lodestar information, the amount of Jennings's compensable post–1995 services involving appeals and dispositive motions would roughly be equivalent to the amount of non-compensable pre–1996 services it rendered. Therefore, at least $260,000 in services would be allowable. In addition, allowing that 50% of the $150,000 in time spent on the Pincus trial on remand from the Third Circuit was compensable, *i.e.,* $75,000, the total award under section 330(a) for services provided would be about $335,000.